**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
_____

**EILEEN KAUFMANN,**
          **Plaintiff,**

**v.**                                                                      **Case No. 13-cv-0674**

**EPPSTEIN UHEN ARCHITECTS, INC.**
**MATT HALL, BOB NORMAN, and**
**ABC INSURANCE COMPANY,**
          **Defendants.**
_____

## DECISION AND ORDER

Plaintiff Eileen Kaufmann brings this Title VII action against her former employer, Eppstein Uhen Architects, Inc. ("EUA"), alleging a hostile work environment on the basis of gender and retaliation. She also brings tortious interference with contract claims against two of her former supervisors. Before me now is defendants' summary judgment motion.

### I. Facts

In November 2010, plaintiff began working at EUA in a temporary capacity, and in late 2011, EUA hired her as a full-time project administrator. As a project administrator, plaintiff reported to defendant Matt Hall, EUA's chief financial officer. EUA provided plaintiff with training in her new role. At least one of plaintiff's trainers became frustrated with plaintiff's job performance and lack of progress and reported her concerns to Hall. As a result of this complaint, Hall began monitoring plaintiff's performance. In the course of plaintiff's employment, Hall and plaintiff had several disagreements, during which Hall would yell and plaintiff would cry. Hall does not deny that he has a direct, aggressive and even abrasive management style. Plaintiff complained to defendant Bob Norman, EUA's human resources administrator, about Hall's aggressive style and rudeness to her and

other female employees. EUA brought in a leadership coach to work with Hall, but things did not change.

In October 2012, Hall conducted plaintiff's performance review. He advised plaintiff of several performance problems and indicated that she would have 30 days to improve. The conversation became heated and ended with Hall leaving and plaintiff crying. Subsequently, Hall asked plaintiff to meet with him on the following Monday to continue their discussion concerning her review. Plaintiff declined Hall's request to meet with him. Norman asked plaintiff to explain her refusal to meet, and plaintiff said that she was busy on Monday mornings and didn't have time. Norman communicated this to Hall. Hall then asked plaintiff a second time to meet with him, and plaintiff again refused. Hall concluded that by refusing to meet with him, plaintiff was being insubordinate, and he and Norman met with EUA's president Richard Tennessen and recommended that plaintiff be terminated. Based both on her insubordination and her performance history, Tennessen terminated plaintiff. I will discuss further facts as they become relevant.

## II. Discussion

I may grant summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, I consider all the evidence submitted by the parties, and I draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### A. Hostile Work Environment

Title VII prohibits an employer from engaging in sex discrimination that creates a

hostile working environment. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1143 (7th Cir. 1997). To establish a hostile work environment, plaintiff must show that: "(1) she was subject to unwelcome harassment; (2) that harassment was based on her [sex]; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004). To prevail on a hostile work environment claim under Title VII, it is not enough to show a hostile work environment; plaintiff must show that the environment was more hostile for women than for men. *Gleason*, 118 F.3d at 1145. In a mixed-gender workplace, one way to show gender animus is "to provide evidence of discrepancies in how the alleged harasser treats members of each sex." *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999); *see also Hall v. City of Chi.*, 713 F.3d 325, 333 (7th Cir. 2013) ("If a supervisor treated all women hostilely, we generally permit an inference that the actor was motivated by their gender."). This evidence of recurrent hostile behavior toward females must be "unmatched by similar reports of . . . aggressive behavior toward male co-workers." *Smith*, 189 F.3d at 533.

In an effort to show gender animus, plaintiff relies on: (1) the testimony of several former and current female EUA employees that Hall treated them disrespectfully; (2) similar testimony of a female employee of Hall's previous employer; and (3) her own observations of Hall's treatment of female employees. Plaintiff's argument, however, fails in two respects. First, EUA was not a truly mixed-gender workplace. For most of plaintiff's tenure, all of the project administrators were female, and the only male who reported directly to Hall was Norman. In the absence of any evidence as to how Hall behaved toward males

3

similarly situated to plaintiff, I cannot infer differential treatment. Second, the available evidence indicates that Hall was as aggressive toward male as female employees. EUA's IT Director, Kenneth Seelow, states that he went "toe to toe" with Hall, recounting an incident when Hall became agitated, raised his voice, and insulted Seelow's project. A male project administrator hired several months before plaintiff was terminated characterizes Hall as blunt and pointed in his questioning, and observes that Hall treated him the same as his female counterparts. Erlitz Aff. at 3. A former female employee states that she observed Hall "attack" several male employees listing three toward whom he behaved aggressively. Rettko Aff. Ex. 9, at 7–8. Finally, a male employee of Hall's previous employer notes Hall behaved aggressively and "rules people mostly by fear." Odian Supp. Aff. Ex. T, at 3. Thus, the evidence indicates that Hall behaved aggressively toward men and women and precludes a reasonable factfinder from finding gender animus.

Plaintiff also attempt to establish gender animus by showing that Hall had a gender-discriminatory motive. *Hall*, 713 F.3d at 333. Plaintiff points to his emails to Norman which include the sentences, "AHHHH. . . why does she make everything so something???" and "Sorry but WTF is her issue?" Rettko Aff. Exs. 77, 78 and argues that the pronouns "she" and "her" indicate gender animus. While language can suggest gender animus, *see, e.g.*, *id.* at 333–34 (concluding that the phrase "I could slap that woman and get a promotion" raised a fact issue regarding a gender-discriminatory motive because "slapping" is a form of aggression almost entirely limited to women and "that woman" permitted an inference that gender was a factor), not all gender-specific language indicates gender animus. *Id.* at 334–35 (stating that comments like "I hate her" and "She drives me nuts" do not suggest

gender animus). Hall's use of gender-specific pronouns in the quoted sentences are not enough to enable a reasonable factfinder to infer a gender-discriminatory motive. Plaintiff also points to a conversation in which Hall compared plaintiff to his children, put his finger to his lips, and told her to stop interrupting him and argues that such conversation suggests gender animus because Hall was not treating her as an equal. While such conduct may have been condescending, it is also insufficient to raise a fact issue regarding a gender-discriminatory motive. Thus, plaintiff's claim of a hostile work environment based on gender fails.

Even if plaintiff satisfied the "based on gender" requirement, she would also have to show that Hall's behavior was severe or pervasive. *Luckie*, 389 F.3d at 714. "A hostile work environment must be both objectively and subjectively offensive." *Id.* Whether behavior is objectively and subjectively offensive depends on such factors as its frequency and severity, whether it is humiliating or physically threatening, whether it unreasonably interferes with an employee's work performance and whether it is psychologically harmful. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Low-level harassment or mere workplace unpleasantness is not actionable under Title VII. *Gleason*, 118 F.3d at 1144. In other words, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

Plaintiff presents enough evidence to satisfy the "subjectively offensive" requirement. Based on her complaints about Hall's behavior, her description of the stress caused by her interactions with Hall, a reasonable juror could conclude that Hall's conduct was subjectively offensive. Plaintiff's effort to establish that Hall's conduct was objectively

5

offensive, however, is less successful. Plaintiff attempts to show a pattern of pervasive conduct that amounted to harassment. *Hall*, 713 F.3d at 332 ("[I]ncidents, which viewed in isolation seem relatively minor, that consistently or systematically burden women throughout their employment are sufficiently pervasive to make out a hostile work environment claim."). She relies heavily on *Hall v. City of Chicago*, in which the Seventh Circuit concluded that evidence indicating that a supervisor "isolated [plaintiff] from her coworkers by assigning her unnecessary menial work and preventing others from interacting with her . . . compounded . . . by sporadically intimidating and directing anger at her" was sufficient to survive summary judgment. *Id.* at 330. Plaintiff's evidence of harassment, however, falls well short of the evidence in *Hall*. Plaintiff argues that Hall isolated her because he told her to direct questions on certain subjects to her trainers rather than other employees, "gathered dirt" on her performance so as to portray her as incompetent to other employees, and excluded her from a meeting. But telling plaintiff to direct questions to the people responsible for her training was entirely appropriate. Further, the evidence makes clear that Hall did not begin monitoring plaintiff's work until one of her trainers voiced concerns about it. And Hall attempted to keep the monitoring secret, which undermines plaintiff's assertion that he sought to portray her as incompetent to others.

Plaintiff also attempts to establish that Hall's aggressiveness was comparable to the verbal outbursts and intimidation described in the *Hall* case. She points to (1) a conversation in which Hall scolded her for talking about another employee and told her not to interrupt him, holding his finger to his mouth; (2) her review meeting in which Hall told her that she was making too many errors and refused to show them to her leading to an

argument; and (3) the circumstances of her termination, including Hall's invitations to meet, one of which was to occur "after you have a chance to get your head wrapped around the things we discussed this morning," Rettko Aff. Ex. 1, at 20, and her termination meeting, at which Hall "blew up." While some of Hall's behavior during these interactions may have been boorish and unprofessional, none of it rises to the level of aggression and intimidation described in the *Hall* case where the plaintiff's supervisor tried to physically bump her, called her "stupid," and menaced her with his hand while telling her to "get out." *Hall*, 713 F.3d at 329. Finally, plaintiff relies on her observations that Hall was rude to other female employees. This evidence is relevant but does not establish that *plaintiff* experienced a hostile work environment. *Gleason*, 118 F.3d at 1144.

In sum, plaintiff's evidence is insufficient to enable to reasonable factfinder to find behavior objectively severe or pervasive enough to be actionable under Title VII. Plaintiff points to three incidents in eight months of full-time employment in which Hall was verbally aggressive to her, does not present any behavior that was physically threatening or humiliating, and much of her evidence involves other women's interactions with Hall. *See, e.g.*, *Luckie*, 389 F.3d at 714 ("The conduct in question consists of isolated events that were not physically threatening or humiliating and in some cases were not even directed at [plaintiff]. The evidence is insufficient to show a workplace permeated with discriminatory ridicule, intimidation, and insult."). And, as discussed, plaintiff's evidence falls well short of that presented in the *Hall* case.

7

**B. Retaliation**

An employer may not retaliate against an employee who has complained about discrimination or other practices that violate Title VII. *Id.* Here, plaintiff attempts to establish retaliation using the direct method of proof, which requires her to show that: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Id.* With respect to the first element, "although filing an official complaint with an employer may constitute statutorily protected activity under Title VII, the complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663–64 (7th Cir. 2006) (concluding that complaints about "harassment" and "pay discrimination" were not protected activity under Title VII because they did not indicate the harassment and discrimination were based on his sex or his national origin). Generalized complaints are not sufficient. *Gleason*, 118 F.3d at 1146–47.

Although plaintiff complained several times about Hall's behavior, she complained about Hall's personality–that he was rude, disrespectful, and caused her to experience anxiety. Plaintiff points to only one complaint in which she mentioned gender and that involved her statement to Norman that "Matt seems to have a problem with women here." Rettko Dep. Ex. 1, at 8. Further, plaintiff made this statement in the context of expressing concern about the stress level of the other project administrators, all of whom were female. This is not enough to constitute protected activity under Title VII.

Even assuming that it was enough, plaintiff still must show that her complaint caused her termination. "In order to demonstrate the 'causal link,' [plaintiff] must

demonstrate that [defendant] would not have taken the adverse action 'but for' the protected expression." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). Plaintiff argues that Hall planned to get her fired because he was angry about her complaints about him, and that they led to his having to work with a leadership coach. She further contends that Hall's plan involved meeting with management to make it appear that his relationship with plaintiff had improved (when it hadn't) so that he could blame her for future difficulties; secretly collecting information about plaintiff's performance in order to fire her; and continuing to intimidate her. The evidence, however, does not support this claim. No evidence supports plaintiff's assertion that Hall's meeting with management was a "staged performance" to mislead management. Also, the evidence indicates that plaintiff's trainer and other employees voiced concerns about her performance to Hall, undermining plaintiff's assertion that Hall's information gathering was retaliatory. No evidence supports plaintiff's assertion that Hall was working to get her fired. Even as to plaintiff's review meeting, the evidence indicates that Hall intended to give plaintiff additional time to improve her performance. Further, none of these "retaliatory" actions were unreasonable. As plaintiff's direct supervisor, Hall's job was to monitor plaintiff's work and meet with her about it.

Finally, Tennessen's testimony makes clear that although the insubordination that plaintiff displayed by declining to meet with Hall was the last straw, his decision to terminate plaintiff was also based on her poor job performance and lack of progress. Tennessen's testimony undermines any inference that Hall's alleged scheme was a "but for" cause of plaintiff's termination. Thus, plaintiff fails to establish the required causal link between her complaints and her termination.

9

**C. Tortious Interference**

Under Wisconsin law, the elements of tortious interference with a contract are: "(1) the plaintiff had a contract or prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Dorr v. Sacred Heart Hosp.*, 228 Wis. 2d 425, 456 (Ct. App. 1999). Plaintiff was an at-will employee, and "[t]here can be tort liability for interference with a contract terminable at will." *Mackenzie v. Miller Brewing Company*, 234 Wis. 2d 1, 46 (Ct. App. 2000) (internal quotations omitted). In proving interference, plaintiff must show that such interference was "improper." *Id.* "In determining whether interference is 'improper,' we consider: (a) The nature of the actor's conduct; (b) The actor's motive; (c) The interests of the other with which the actor's conduct interferes; (d) The interest sought to be advanced by the actor; (e) The social interests in protecting the freedom of action of the actor and the contractual interest of the other; (f) The proximity or remoteness of the actor's conduct to the interference; and (g) The relations between the parties." *Id.*

Plaintiff's improper interference argument is similar to her hostile work environment and retaliation arguments: that Hall isolated her from her co-workers by telling her she could only direct certain questions to her trainers, gathered information on plaintiff's job performance to look for reasons to fire her, confronted plaintiff with errors at her review meeting but refused to show them to her, and invited her to meetings to create insubordination so that she would be fired. For the reasons previously discussed, the evidence fails to support plaintiff's allegation that Hall improperly interfered with her

10

employment contract. The actions that Hall complains about, such as gathering information about her performance, were part of Hall's job. *See id.* at 52 ("[An employee's supervisor] was in a legitimate position to comment on [plaintiff's] . . . abilities.").

Even if plaintiff could show intentional, improper interference, she would still have to show that defendants' actions were not privileged or justified. Under Wisconsin law, "[t]ortious employee conduct which is otherwise actionable may be privileged on public policy grounds if the conduct is in the furtherance of some interest of societal importance." *Wolf v. F&M Banks*, 193 Wis. 2d 439, 460 (Ct. App. 1995). For example, the transmission of truthful information is privileged and "does not constitute improper interference with a contract, and cannot subject one to liability for tortious interference with contract." *Liebe v. City Fin. Co.*, 98 Wis. 2d 10, 13 (Ct. App. 1980). Hall and Norman contend that at most, they provided truthful information about plaintiff to Tennessen when recommending termination. Plaintiff disputes this but presents no evidence indicating that either Hall or Norman made any material misstatement. Plaintiff points to Tennessen's difficulty in recalling the order of events or minor details at his deposition, but this is not enough to create a fact issue as to whether Hall or Norman provided him with any untruthful information. Thus, plaintiff's claim fails.

### III. Conclusion

**THEREFORE, IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 9th day of February, 2015.

                                                         s/ Lynn Adelman
                                               _____
                                               LYNN ADELMAN
                                               District Judge